UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
UNITED STATES OF AMERICA,       :
         :
    -against-         :
         :
WILLIAM MORAN,         :
         :
       Defendant.       :
------------------------------------------------------------ x

**REPORT AND
RECOMMENDATION**

14 Crim. 348 (NGG) (VMS)

**Vera M. Scanlon, United States Magistrate Judge:**

      Defendant William Moran pleaded guilty to a two-count information charging him with conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 and tax evasion in violation of 26 U.S.C. § 7201.  The United States Probation Department submitted a Pre-Sentence Investigation Report ("PSR") and Sentence Recommendation.  See ECF Nos. 21, 21-1. Defendant and the Government submitted sentencing memoranda, and Defendant submitted a reply.  See ECF Nos. 33, 36-37.  The District Court referred the case to this Court to hold a Fatico hearing and to issue a report and recommendation on the appropriate loss and restitution amounts disputed in the parties' sentencing submissions.[1]  The Court held a Fatico hearing, and the parties filed supplemental submissions at the Court's request.  See 10/20/2023 Minute Entry; ECF Nos. 41-43.  For the following reasons, this Court respectfully recommends that the District Court find that the appropriate loss amount and restitution amount for Defendant's fraud conviction is $1,767,206.97.

---

[1] As discussed, infra, Defendant pleaded guilty to Conspiracy to Commit Bank Fraud, a violation of 18 U.S.C. § 1349, and Tax Evasion, a violation of 26 U.S.C. § 7201.  The parties do not dispute the appropriate loss and restitution amount for Defendant's tax evasion conviction.  In accordance with the District Court's referral order, this report and recommendation evaluates only the loss and restitution amounts that are "disputed," i.e., the loss and restitution figures for Defendant's fraud conviction.  See 9/13/2023 Order.

## I. Background

### a. The Fraudulently Induced Loans

The Court assumes familiarity with the underlying facts and summarizes only the relevant facts set forth on the docket, in the PSR and in the parties' submissions, including submissions offered during the Fatico hearing.  Defendant was employed as the comptroller of USA United Holdings, Inc., also known as Shoreline Merge, Inc., and several subsidiary companies (together, "the United Entities") between May 2004 and July 2011.  ECF No. 21 ¶¶ 5-6.  All of the United Entities were bus companies that provided transportation to children attending New York City public schools.  Id. ¶ 5.

On June 17, 2004, the United Entities applied to Comerica Bank ("Comerica") for a $10 million loan (the "2004 Loan"), the "primary purpose" of which was to establish and fund an employee stock option plan (the "ESOP") under the Employee Retirement Income Security Act of 1974 ("ERISA") for the benefit of non-union employees of the United Entities.  Id. ¶ 8.  $7.6 million of the $10 million principal amount was purposed to fund the ESOP.  See 2004 Loan Agreement, Defendant's Fatico Hearing Exhibit C at 3.  Pursuant to the agreement, the United Entities were required to make payments in monthly installments of principal and interest in the amount of $135,850, beginning on August 1, 2004, and ending on the loan's maturity date, June 1, 2008, i.e., three years and ten months later.  Id. at 7.  Although the loan's term was three years and ten months, the monthly payments were "calculated at an assumed fixed interest rate and an assumed amortization term of 7.5 years."  Id.  As a result, a balance due would remain at the end of the loan's term.  The agreement afforded Comerica the option to recalculate the monthly installment amount from time to time "so that the remaining periodic installments will fully

amortize the remaining loan balance within the remaining amortization term in equal installments at the interest rate then being charged under the Term Note." Id.

On October 30, 2007, approximately seven months before the 2004 Loan's maturity date, the United Entities executed an agreement with Comerica that amended and restated the 2004 Loan for an additional $4.5 million (the "2007 Loan"). ECF No. 21 ¶ 9. When the 2007 Loan agreement was executed, the 2004 Loan had an unpaid principal balance of $437,851.37. The 2007 Loan's term began on November 15, 2007; it was set to end on October 15, 2012. ECF No. 42-1 at 7-8.

Defendant prepared false and fraudulent financial statements that were submitted in connection with the 2004 and 2007 loans. ECF No. 21 ¶ 10. Defendant concealed diversions of funds to Laraine Castellano—who controlled the United Entities—and her family, overstated the financial condition of the United Entities in the amount of the diversions and misrepresented its financial condition to Comerica. ECF No. 33 at 10. Despite establishing the ESOP by filing required forms with the United States Department of Labor, the United Entities never made the required disclosures to their employees and never funded the ESOP as promised to Comerica Bank. ECF No. 21 ¶ 8. As a result, nearly all United Entities employees who were the purported beneficiaries of the ESOP were unaware that the ESOP existed, and they never received the benefits to which they would have been entitled. Id. The United Entities stopped making payments on the loans in 2011. See ECF No. 33 at 16. Comerica "declared a default[,] accelerated the United Entities'[s] indebtedness[,] and then sued for the appointment of a receiver and foreclosure on the collateral." Id. (citing In re United Fleet et al., No. 11-45867 (Bankr. E.D.N.Y.), and Comerica Bank v. Shoreline Merge, et al., 11 Civ. 3092 (RRM) (JXA) (E.D.N.Y)). The United Entities filed for Chapter 11 bankruptcy reorganization, which was

converted to a Chapter 7 liquidation.  Id.  "Comerica's collateral was sold at a distressed price in

a Section 363 sale.  With Comerica's consent and the bankruptcy court's approval, the proceeds

were invaded and depleted to pay the fees and expenses of the bankruptcy trustee, his attorneys

and his accountants."  Id.  According to Defendant, "Comerica received only $6,770,394.00 from

the proceeds of its sale, and received no further money in the bankruptcy."  Id. at 35 (citing In re

United Fleet et al., Case No. 11-45867 (Bankr. E.D.N.Y.), Docket Nos.  841-1 p. 3, and 857 p.

105).

The 2004 Loan ended with an unpaid principal balance of $437,851.37, and the 2007

Loan ended with an unpaid principal balance of $1,947,097.93.  PSR ¶ 11.  The Government

represents that

> once it became clear to Comerica that it would receive no additional payments
> directed toward these Loans (and others) from the United Entities, Comerica
> reallocated certain monies it had received and credited towards interest payments
> and other fees on the cumulative debt owed by the United Entities towards the
> reduction of the principal value of the 2004 and 2007 Loans (and other loans).
> The results of these transfers are "charge off" amounts of $0 for the 2004 Loan
> and $1,767,206.97 for the 2007 Loan on the books of Comerica.

See ECF No. 36 at 3.

The Government's investigation into the fraud conspiracy revealed that for tax years

2009, 2010 and 2011, Defendant failed to report a portion of the income he received through his

employment with the United Entities.  PSR ¶ 12.  The IRS determined that Defendant's tax

evasion caused it to suffer a federal tax loss of $37,778.  Id.

Defendant pleaded guilty to Conspiracy to Commit Bank Fraud, a violation of 18 U.S.C.

§ 1349, and Tax Evasion, a violation of 26 U.S.C. § 7201.  Id. ¶ 16.

### b.  The PSR's Loss Calculations

The PSR sets forth that, for the purposes of sentencing, Comerica suffered a total loss of

$2,384,949.30 as a result of Defendant's fraud.  Id. ¶ 11.  The Probation Department calculated

Comerica's loss by adding the principal owed on the 2004 Loan ($437,851.37) to the principal

owed on the 2007 Loan ($1,947,097.93).  Id.  Although the Government acknowledges that

Comerica reallocated funds to reduce the balances of the loans so that the "charge off" amount

was zero on the 2004 Loan and $1,767,206.97 on the 2007 Loan, the PSR concludes that the

unpaid principal balances "constitute[] the actual loss[es] suffered by the bank, as no proceeds

were recovered."[2]  Id.  The PSR sets forth that, "[s]ince the loss exceeded $1,500,000 and was

less than $3,500,001, 16 levels are added [to the base offense level pursuant to U.S.S.G. §

2B1.1(b)(1)(I)."  Id. ¶ 16.  As to the restitution amount, the PSR states that, "[p]er the

Government, it appears that Comerica Bank is seeking restitution in the amount of

$1,767,206.97" in connection with the fraud conviction.  Id. ¶ 13.

### c.  The Parties' Loss Calculations

The Government argues that Comerica's total loss arising from Defendant's fraud, for

both sentencing and restitution purposes, is the final "charge off" amount of the 2007 Loan, i.e.,

$1,767,206.97.  See ECF Nos. 36 at 3-4; 41 at 1.  The Government does not attribute any loss to

the 2004 Loan, for which Comerica reduced the unpaid principal balance to zero and therefore

did not charge any balance off.  See ECF No. 41 at 2.  Defendant argues that Comerica's total

loss is zero for both sentencing and restitution purposes, because the 2007 Loan's charge-off

losses are offset by interest revenues Comerica received on the loans; any loss was not

reasonably foreseeable; and the Government has not established causation.[3]  See ECF No. 33 at

17-33.

---

[2] The PSR does not make clear why it does not credit the funds reallocated to pay down the
principal as proceeds recovered.

[3] As to the conviction for tax evasion, the parties agree that the IRS suffered a loss of $37,778.
See ECF No. 21 at 7; ECF No. 33 at 9-10; ECF No. 36 at 6.

### i. Documentation

The Government submitted with its original sentencing memorandum a one-page document containing an "IRS Loss Information Spreadsheet," which purportedly shows the balances for the two loans as of February 20, 2019.  See ECF No. 36-1.  Defendant submitted portions of two additional spreadsheets, the "Loan 34 Spreadsheet" and the "Loan 208 Spreadsheet," which he "received from the government, as a combined document . . . totaling 25 pages, which together are said to set forth the history" of the loans.  See ECF No. 33-10.  The Government asserts that the Loan 34 and Loan 208 spreadsheets show the "drawing down on the credit made available to [the United Entites] by Comerica through the operative loan agreements and, from time to time, making payments towards the loans' outstanding principal and interest." See ECF No. 36 at 4.

### A. IRS Loss Information Spreadsheet

The IRS Loss Information Spreadsheet contains five columns.  The first two columns show balances for a loan labeled "#34," which the Government contends represents the 2004 Loan, and a loan labeled "#208," which the Government contends—and Defendant does not dispute—represents the 2007 Loan.  See ECF Nos. 36 at 4; 36-1.  For loan # 34, the spreadsheet shows a principal balance of $437,851.37; an interest balance of $260,790.25; late fees of $12,825.58; a paid-to-principal[4] balance of $437,851.37; and lists no "charge off" amount.  See id.  For loan # 208, the spreadsheet shows a principal balance of $1,947,097.93; an interest balance of $1,339,735.78; late fees of $41,095.03; a paid-to-principal balance of $179,890.96; and a "charge off" amount of $1,767,206.97.  See id.

---

[4] Labeled on the spreadsheet as "Pd to Princ."

### B.  The Loan 34 Spreadsheet

The Loan 34 Spreadsheet, according to the Government, represents the drawing down of the credit made available to United Entities via the 2004 Loan.  See ECF No. 36 at 4.  The spreadsheet, which consists of two pages, begins on June 21, 2004, with a principal balance of $1,248,648.14 and ends on July 8, 2013, with a principal balance of $437,851.37.[5]  Id.  The Government represents that the Loan 34 Spreadsheet shows that the United Entities made a total of $1,034,164.22 in interest payments over the life of the loan.  See ECF No. 33-10 at 3-4; ECF No. 41 at 4.  Defendant disputes that the Loan 34 Spreadsheet is related to the 2004 Loan, and asserts that the spreadsheet is instead related to "a separate line of credit that Comerica extended to the United Entities at around the same time."  See ECF No. 43 at 6 n.2.  At the Fatico hearing, Defendant presented documentary evidence supporting his argument that the Loan 34 Spreadsheet is unrelated to the loans at issue in this case.  See Defendant's Fatico Hearing Exhibits A-C.  The Government contacted Comerica regarding Defendant's claim that the Loan 34 Spreadsheet is not related to the 2004 Loan.  Comerica maintains that the Loan 34 Spreadsheet is related to the 2004 Loan, but it has not provided any documentation or information in support of that representation.  See Fatico Hearing Transcript at 19-21.

---

[5] Defendant omitted from his submission the final 22 pages of the Loan 34 spreadsheet "because they reflect no interest revenue to Comerica nettable against its unpaid principal balance due. (They reflect no money transfers whatsoever between Comerica and the United Entities, just a constant unpaid principal balance due, and the accrual of unpaid interest[.]) The full Loan 34 spreadsheet appears within Exhibit 1 to the sentencing submission of George Silverman. Docket 21-3, United States v. Silverman, Cr 15-125 (NGG) (EDNY)."

### C. The Loan 208 Spreadsheet

The parties do not dispute that the Loan 208 Spreadsheet is associated with the 2007 Loan. The Loan 208 Spreadsheet indicates that the ending principal balance for the 2007 Loan was $1,947,097.93. See id. Defendant represents that the Loan 208 Spreadsheet "reflects that bankruptcy distributions to Comerica from the sale of its collateral had already been applied to reduce that principal balance to [$1,947,097.93], and that other such distributions had been or subsequently were applied to reduce accrued unpaid interest." See ECF No. 37 at 2. The parties have not identified which entries on the Loan 208 Spreadsheet represent bankruptcy distributions to reduce the principal balance to $1,947,097.93, but the parties do not appear to dispute that the principal balance was reduced to that amount. The parties also do not appear to dispute that, after the bankruptcy distributions were applied to reduce the 2007 Loan's balance to $1,947,097.93, Comerica reallocated funds to further reduce the principal balance to the final charge-off amount of $1,767,206.97.

## II. Legal Standards

### a. Fatico Standards

A Fatico hearing is an evidentiary proceeding to resolve disputed facts prior to sentencing. See United States v. Cuevas, 496 F.3d 256, 260 (2d Cir. 2007)); see generally United States v. Fatico, 579 F.2d 707 (2d Cir. 1978). The standard of proof at a Fatico hearing is a preponderance of the evidence. See United States v. Vaughn, 430 F.3d 518, 525 (2d Cir. 2005); United States v. Whiteside, 207 F. Supp. 3d 311, 320 (S.D.N.Y. 2016). The Federal Rules of Evidence do not apply to sentencing. See Fed. R. Evid. 1101(d)(3). "[T]he Court may consider any relevant information that has sufficient indicia of reliability." Whiteside, 207 F. Supp. 3d at 320 (citing U.S.S.G. § 6A1.3(a)).

### b. Restitution And Loss Standards

"Though restitution and loss involve closely related calculations, which ultimately produce the same figure in many cases, the inquiries are not identical." United States v. Certified Envtl. Servs., 753 F.3d 72, 102 (2d Cir. 2014). Restitution performs a compensatory function, see United States v. Gonzalez, 647 F.3d 41, 65 (2d Cir. 2011), and "focuses on the victim and the harm proximately caused by the defendant's conduct," United States v. Certified Envtl. Servs., 753 F.3d 72, 102 (2d Cir. 2014) (internal quotation marks omitted). "Loss under the fraud guideline, by contrast, focuses on the defendant, and seeks, however imperfectly, to measure the seriousness of his or her criminal conduct." Id. (citing United States v. Byors, 586 F.3d 222, 225 (2d Cir. 2009)). "A defendant's culpability will not always equal the victim's injury," United States v. Catherine, 55 F.3d 1462, 1465 (9th Cir. 1995); therefore, "an amount-of-loss calculation for purposes of sentencing does not always equal such a calculation for restitution," United States v. Germosen, 139 F.3d 120, 130 (2d Cir. 1998). As discussed in greater detail below, restitution compensates "actual loss" caused by the defendant. See United States v. Marino, 654 F.3d 310, 320 (2d Cir. 2011). "Loss for purposes of the fraud guideline, by contrast, is defined as 'the greater of actual loss or intended loss.'" Certified Envtl. Servs., 753 F.3d at 103 (quoting loss.U.S.S.G. § 2B1.1 cmt. n.3(A)).

### i. Calculating The Restitution Amount Under The Mandatory Victims Restitution Act ("MVRA")

The MVRA sets forth that the court shall order a defendant convicted of an offense against property under Title 18, "including any offense committed by fraud or deceit," to pay restitution to a victim who "has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1). A "victim" under the statute is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2).

Direct harm is established "where a defendant's action was the 'but for' cause of the harm," and proximate harm is established where the "harm alleged has a sufficiently close connection to the conduct at issue" including where the harm was foreseeable. United States v. Williams, 811 F. App'x 690, 691 (2d Cir. 2020).

It is the Government's burden to demonstrate, by a preponderance of the evidence, "the amount of the loss sustained by a victim as a result of the offense." 18 U.S.C. § 3664(e); United States v. Reifler, 446 F.3d 65, 113 (2d Cir. 2006). "The 'primary and overarching goal of the MVRA is to make victims of crime whole' to 'compensate these victims for their losses and to restore the[m] to their original state of well-being.'" United States v. Thompson, 792 F.3d 273, 277 (2d Cir. 2015) (alteration in original) (quoting United States v. Qurashi, 634 F.3d 699, 703 (2d Cir. 2011)). Restitution must therefore be ordered "in the full amount of, but not in excess of, [the victim's] loss." United States v. Gonzalez, 647 F.3d 41, 65, 67 (2d Cir. 2011). Courts have approved the use of a loan's "charge off" amount to determine a victim-lender's loss. See Williams, 811 F. App'x at 691; United States v. Sexton, 894 F.3d 787, 800 (6th Cir. 2018).

### ii. Calculating The Loss Amount For Sentencing Under U.S.S.G. § 2B1.1(B)(1)

Sentencing for fraud offenses is governed by the United States Sentencing Guidelines § 2B1.1. See U.S.S.G. § 2B1.1(b)(1). The amount of loss "can increase the adjusted offense level by as few as zero or as many as 30 points, depending on the loss as measured in dollars." United States v. Turk, 626 F.3d 743, 748 (2d Cir. 2010) (citing U.S.S.G. § 2B1.1(b)(1)). The Sentencing Guidelines set forth that, "[s]ubject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." Id. § 2B1.1 cmt. n.3(A)(i). "This may include the harm stemming from the reasonably foreseeable acts and

omissions of . . . co-conspirators." United States v. Barbarino, 612 F. App'x 624, 628 (2d Cir. 2015) (citing U.S.S.G. § 1B1.3(a)(1)(B)). "Intended loss . . . means the pecuniary harm that the defendant purposely sought to inflict; and . . . includes intended pecuniary harm that would have been impossible or unlikely to occur." Id. § 2B1.1 cmt. n.3(A)(ii). The sentencing court must exclude from the loss amount "[i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." U.S.S.G. § 2B1.1, cmt. 3(D)(i). "The sentencing court is only required to make a 'reasonable estimate of the loss.'" United States v. Lacey, 699 F.3d 710, 719 (2d Cir. 2012) (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)).

"In the particular context of sentencing enhancements, it is well-established that '[t]he Government bears the burden of establishing, by a preponderance of the evidence, the amount of the loss for purposes of the sentencing enhancement.'" United States v. Bin Wen, No. 6:17 Crim. 6173 (EAW), 2018 WL 6715828, at *12 (W.D.N.Y. Dec. 21, 2018) (citing United States v. Jimenez, 513 F.3d 62, 86 (3d Cir. 2008)). "However, '[a]lthough the burden of persuasion remains with the Government, once the Government makes out a prima facie case of the loss amount, the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate.'" Id. (citing Jimenez, 513 F.3d at 86).

The loss amount is to be reduced by certain "credits against loss," defined as "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(E)(i). "In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that

time, the fair market value of the collateral at the time of sentencing," must be credited against loss. Id. § 2B1.1 cmt. n.3(E)(ii)).

Calculation of the foreseeable pecuniary harm "is made as of the time of sentencing, and 'the only loss that need have been foreseeable to the defendant is the loss of the unpaid principal.'" United States v. Nawaz, 555 F. App'x 19, 25 (2d Cir. 2014) (quoting Turk, 626 F.3d at 749-50). Even where a loan is collateralized, loss of the unpaid principal is foreseeable, and a reduction in value of the collateral need not have been foreseeable. See Turk, 626 F.3d at 750-51. In Turk, the defendant-appellant pleaded guilty to wire fraud and was "sentenced to 60 months' imprisonment and ordered to pay $29,660,192.36 in restitution to the victims of the mortgage fraud she perpetrated." Id. at 744. The defendant-appellant argued that, in applying the Sentencing Guidelines, the district court

> erred in calculating the amount of loss that [her] fraud caused. Specifically, she argue[d] that the loss amount should be treated as zero because, at the time her fraud was discovered, there was still market value in the real property that purportedly collateralized the loans she had fraudulently obtained, and if that property had been sold before the collapse of the housing market, her victims could have been made whole.

Id. The court "emphatically reject[ed]" defendant-appellant's argument and affirmed, holding that "it cannot possibly be the case that the decline of the collateral's value must be foreseeable in order to calculate loss amount if the offset is set as of the time of sentencing, as the defendant can never know what the collateral's value will be at that arbitrarily chosen time." Id. at 744, 750-51 (emphasis in original). The court adopted the reasoning of United States v. Mallory, 709 F. Supp. 2d 455 (E.D. Va. 2010), in which the court held that

> the loss of the unpaid principal is an eminently foreseeable consequence of the fraudulent conduct. Partial recovery of this loss through seizure and sale of collateral may reduce the net loss amount through operation of the "credits against loss" provision, but it does not diminish the foreseeability of the financial institutions' loss of the unpaid principal amounts in the first instance.

Mallory, 709 F. Supp. 2d at 458.

### iii.  Consideration Of Interest Revenues In Calculating Loss

The parties disagree as to whether the calculation of Comerica's loss for sentencing and restitution should be reduced by interest revenues that Comerica earned on the fraudulent loans during the scheme.  As discussed below, courts in this circuit addressing the issue have generally rejected the approach proposed by Defendant.

### A.  Interest Revenues Should Not Be Considered In Calculating Restitution

The Second Circuit has rejected the argument that the restitution loss amount should be reduced by interest revenues that a victim-lender receives during the course of a fraudulent loan scheme.  See United States v. Rivernider, 828 F.3d 91, 115 (2d Cir. 2016).  Rivernider involved a real estate scheme in which the defendant-borrowers secured mortgage loans from victim-lenders based on inflated appraisal values.  Id. at 100.  After the defendants pleaded guilty to wire fraud, the government submitted a proposed restitution order in which it assessed losses to the victim-lenders by calculating "the total unpaid principal for each of the 104 loans, and reduc[ing] the total unpaid principal by funds generated by the sale of the property or, where the property had not been sold, the fair market value of the property." Id. at 103.  In calculating the loss amount, the government did not consider any interest payments that the defendant-borrowers had made on the mortgages during the course of the scheme.  The district court adopted the government's proposed methodology in relevant part.  Id.  The defendants appealed, arguing that the restitution order "improperly included interest in the restitution calculation with respect to the real estate scheme because the mortgage payments [defendants] made during the course of the scheme largely applied (under the terms of the mortgage) to interest rather than the principal." Id. at 115.  The defendant-appellant argued that the district court's failure to offset

the unpaid principal with the interest payments on the fraudulent loan resulted in a windfall to the victim.  See Brief for Defendant-Appellant at 23-24, United States v. Rivernider, No. 14-4582-CR (2d Cir. Jun. 1, 2015).  The Second Circuit rejected the defendants' argument and affirmed the restitution order, holding that "[a]ny interest previously paid by the defendants was charged by the victim-lenders while the scheme was ongoing—not by the district court in the restitution order."[6] Id. at 115-116.

In adopting this approach, the Second Circuit implicitly rejected the argument that the loss calculation should undo the terms and administration of the loan during the scheme. Instead, the loss calculation is made at the time of sentencing.[7] See Nawaz, 555 F. App'x at 25. The Ninth Circuit has also declined to consider a defendant's interest payments on a loan in calculating restitution, holding that "[i]nterest paid is irrelevant except that it reduces the total outstanding interest."  See United States v. Davoudi, 172 F.3d 1130, 1136 (9th Cir. 1999).

---

[6] The Court acknowledges that some courts have held to the contrary—that money received through a fraudulently induced loan should be considered and should serve to reduce the actual loss for restitution purposes.  See, e.g., United States v. Miller, No. 3:20 Crim. 48 (JD), 2023 WL 6439526, at *1 (N.D. Ind. Oct. 3, 2023) (proposed restitution amounts were "appropriately reduced by interest paid on [the victims'] investments by [the defendant] and [the victims' recovery on relevant investments from the bankruptcy proceeding"); United States v. Jesenik, No. 3:20 Crim. 228 (SI), 2023 WL 8016732, at *9 (D. Or. Nov. 20, 2023) ("payments of interest or return of principal" used to reduce loss amount in "money in vs. money out" calculation method).  As seen in Rivernider, the Second Circuit does not align with these courts on the issue.

[7] In rejecting the interest-netting approach to restitution loss calculation, the Rivernider Court noted that the Sentencing Guidelines exclude interest from the loss calculation.  Id. at 115 (citing Turk, 626 F.3d at 749, and U.S.S.G. § 2B1.1 cmt. n.3(D)(i).  The Rivernider Court's reference to sentencing loss calculation in its discussion of restitution calculation appears to be an acknowledgement that the two standards overlap.  The Ninth Circuit has similarly held that "[t]he treatment of interest should be identical in the loss calculation under § 3663" and the loss calculation under the Sentencing Guidelines.  United States v. Davoudi, 172 F.3d 1130, 1136 (9th Cir. 1999).

**B.  Interest Revenues Should Not Be Considered In Calculating The Loss Amount For Sentencing**

As with the restitution calculation, interest revenues that a victim earns on a fraudulent loan should not be netted against the loss amount in determining the appropriate sentence. Courts in this circuit have held that, in calculating loss for sentencing purposes, "credits against loss" do not include payments made by a defendant to a victim in order to continue a fraudulent scheme.  See United States v. Vilar, 729 F.3d 62, 96 n.34 (2d Cir. 2013); United States v. Barbera, No. 02 Crim. 1268 (RWS), 2005 WL 2709112, at *5 (S.D.N.Y. Oct. 21, 2005).  In Vilar, the defendants were investment managers who misrepresented how their clients' funds were being invested, resulting in millions of dollars in losses for the investors.  See Vilar, 729 F.3d at 68.  During sentencing, the district court calculated the victims' losses to be between $20 million and $50 million.  The defendants argued that the district court should have calculated the loss amount to be zero because the victims "received profits from [defendants' company] during the course of the scheme, and therefore did not actually lose money."  Id. at 96 n.34.  The court rejected the defendants' argument and stated that the "defendants should not benefit from attempting to ensure the continuation of their scheme . . . or from inducing investors to reinvest certain interest payments received."  Id.

In Barbera, the defendant defrauded a union's medical insurance fund by including an illegitimate employee in its medical insurance plan.  See Barbera, 2005 WL 2709112, at *2.  The defendant argued that, in calculating loss under the Sentencing Guidelines, the court should net premiums the defendant paid to the union the against the losses the union incurred.  Id.  The Court rejected the defendant's argument and held that "[w]here, as here, the payment of certain funds is necessary in order for the scheme to continue, the amount paid to sustain the scheme may not be used to offset the gross loss amount."  Id.

15

Courts in other circuits have explicitly rejected the argument that interest revenues should offset unpaid principal in determining loss for sentencing.  See United States v. Peugh, 675 F.3d 736, 741 (7th Cir. 2012) ("[T]he district court correctly declined to deduct [the defendant's] interest payments from the loss amount.  These payments were not money 'returned' to State Bank: they did not reduce the loans' outstanding principal balance; instead they were exchanged for value in the form of time holding the bank's money."), rev'd on other grounds by Peugh v. United States, 569 U.S. 530 (2013); Davoudi, 172 F.3d at 1136 ("Banks extend loans for the sole purpose of earning interest income; allowing Davoudi to subtract interest payments from the principal the bank lost would treat the mortgage as an interest-free loan. In fact, unpaid interest in fraudulent loan cases is considered an actual loss to the victims. District courts may choose to include unpaid interest still due on the loan in the calculation of the victim's actual loss.  Interest paid by the defendant can not, thus, reduce the amount of principal lost by the victim; it can only reduce the amount of interest outstanding on the loan."); United States v. Allen, 88 F.3d 765, 771 (9th Cir. 1996) ("[T]he district court used only the loan principal to calculate the 'amount of the loan;' it did not consider the accrued interest. Therefore, payments made towards interest cannot be considered as repayments made on the loan."); cf., United States v. Ballesteros-Garcia, No. 16-11741, 2023 WL 2446725, at *4 (11th Cir. Mar. 10, 2023) ("[T]he court did not clearly err by declining to reduce the loss amount stemming from either property by the payments that [defendant] made.  As the record reflects, the government provided evidence that those payments went to 'interest only' rather than principal.").  As discussed, supra, the Second Circuit has endorsed this view in the context of restitution.  See Rivernider, 828 F.3d at 115.

### III. Discussion

#### a. Sufficiency Of The Government's Evidence

The Government submitted evidence indicating that the 2007 Loan ended with an unpaid principal balance $1,947,097.93, and a final "charge off" amount of $1,767,206.97.  See ECF Nos. 36-1; 33-10.  Defendant does not challenge the accuracy of these figures, and the Court has no reason to doubt their accuracy.  The Government submitted evidence that the 2004 Loan ended with a principal balance of $437,851.37, prior to Comerica's reallocation of funds to reduce the balance to zero.  See ECF No. 36-1.  Defendant challenges the accuracy of the $437,851.37 figure.  See ECF No. 33 at 21.  During the Fatico hearing, Defendant provided persuasive evidence that the Loan 34 Spreadsheet is not related to the 2004 Loan, and the Government has failed to rebut that evidence.  Even assuming Government made a prima facie showing that the 2004 Loan ended with a principal balance of $437,851.37, the Court finds that Defendant met his burden of showing that the Government's evidence supporting that figure is "incomplete or inaccurate."  See Jimenez, 513 F.3d at 86.  Accordingly, the Court does not believe that the Government has established, by a preponderance of the evidence, that Comerica suffered any pecuniary harm associated with the 2004 Loan.  See id.

The sufficiency of the evidence as to the $437,851.37 figure is relevant only to determining the pecuniary harm for sentencing purposes, as Comerica does not seek restitution for that amount.  The PSR sets forth that that Comerica's pecuniary harm is appropriately calculated by adding the unpaid principal balances of the 2004 Loan and the 2007 Loan, totaling a loss of $2,384,949.30.  See PSR ¶ 11.  The Government now takes a different position.  The Government represents that Comerica reallocated funds received in bankruptcy in order to pay down the loans' principal balances, thereby reducing the 2004 Loan's principal balance to zero

and the 2007 Loan's principal balance to $1,767,206.97.   The Court sees no reason to doubt the Government's representation that Comerica reduced any remaining balance on the 2004 Loan to zero and therefore did not charge off any principal.  Because Comerica only charged off the $1,767,206.97 balance remaining on the 2007 Loan, the Government represents that $1,767,206.97 constitutes Comerica's total pecuniary harm.  The Government effectively concedes that the 2004 Loan's ending principal balance should not factor into the pecuniary harm calculation.  As discussed, infra, the Court agrees with the Government's approach.

Defendant argues that the Government's evidence is insufficient in another way: that the spreadsheets do not show the total interest revenues Comerica received on the loans.  Defendant argues that this evidence is necessary to the loss calculation because the interest revenues "must be netted against [the] balance due" to determine the loss amount.  See ECF No. 33 at 18. Defendant argues that the Loan 208 spreadsheet demonstrates that Comerica received $800,446.92 in interest revenues on the loan between October 15, 2008 and April 2011.  ECF No. 33 at 25.  Defendant argues that, in addition to the $800,446.92 in interest revenues reflected in the Loan 208 spreadsheet, Comerica received additional interest revenues during the first four years and four months of the loan, for which Comerica has failed to provide documentation.[8]  Id.

_____

[8] Defendant points out that the Loan 208 Spreadsheet begins October 15, 2008, approximately 11.5 months after the 2007 Loan agreement went into effect.  See ECF No. 33 at 23. Defendant's counsel represents that the Government informed him that this resulted from an October 2008 Comerica computer upgrade during which "[a]dvances, repayments of principal, and changes in principal balance occurring post-refinancing, but prior to October 15, 2008, were all conflated forward to October 15, 2008 on the Loan 208 spreadsheet."  Id. at 24.  Defendant appears to be correct that the spreadsheet is incomplete as to the interest paid by the United Entities on this loan.  Because the Court believes that the undisputed charge-off amount is the only relevant number, the fact that the 208 Spreadsheet begins October 2008 does not impact the analysis.

Defendant argues that these additional undocumented interest revenues, when added to the $800,446.92 in documented interest revenues, would indisputably outweigh the 2007 Loan's charge-off amount, resulting in an actual loss of zero. Id. at 25. As discussed, infra, Comerica's interest revenues do not factor into the loss and restitution calculations; the Court therefore does not need to determine the sufficiency of the interest-payment evidence.

The Court respectfully recommends that the District Court find that the Government has met its burden of demonstrating by a preponderance of the evidence that the 2007 Loan ended with an unpaid principal balance of $1,947,097.93 and a final "charge off" balance of $1,767,206.97. The Court respectfully recommends that the District Court find that there is insufficient evidence to determine the 2004 Loan's unpaid principal balance.

### b. Loss Calculation

In light of the Second Circuit's rejection of the interest-netting approach in Rivernider, this Court respectfully recommends that the District Court decline to reduce the loss amount by Comerica's interest revenues and find that Comerica suffered a total loss of $1,767,206.97—the amount Comerica charged off on the 2007 Loan—for both sentencing and restitution purposes.

### i. Restitution Loss Amount

The Court respectfully recommends that the District Court find that the 2007 Loan charge-off amount—$1,767,206.97—is the "amount of the loss sustained by a victim as a result of the offense." See 18 U.S.C. § 3664(e); Williams, 811 F. App'x at 691. Defendant argues that the Court should net the interest revenues Comerica received on the 2004 and 2007 loans against unpaid principal in determining the restitution amount. Defendant relies on United States v. Boccagna, 450 F.3d 107 (2d Cir. 2006), for the proposition that restitution "attempts to compensate for loss by 'restoring [the victim] to a position he occupied before [the injurious

19

event.'" Boccagna, 450 F.3d at 119 (quoting Hughey v. United States, 495 U.S. 411, 411, 110 S. Ct. 1979, 1980 (1990)). In Boccagna, the court held that, "when recouped property is resold at a nominal price, a court abuses its discretion in using that price to calculate offset value because such a calculation necessarily exceeds the amount necessary to make the victim whole[,]" and results in a windfall to a victim. Id. at 117, 121. Boccagna did not discuss the issue here, i.e., whether declining to net interest payments on a fraudulent loan against unpaid principal on a results in a windfall to the victim. As discussed in Section II(b), supra, the Second Circuit rejected that theory in Rivernider, where the defendant-appellant citied Bocagna in support of its argument that the district court's omission of interest revenues in ordering restitution would result in a windfall to the victim. See Brief for Defendant-Appellant at 23-24, United States v. Rivernider, No. 14-4582-CR, (2d Cir. Jun. 1, 2015); Rivernider, 828 F.3d 115-116. In his post-Fatico submission, Defendant also mistakenly relies on United States v. Thompson, 792 F.3d 273, 274-76 (2d Cir. 2015), which involved money the defendant returned to the victim, not contractually agreed-upon interest payments made on a fraudulent loan. See ECF No. 43 at 2; Thompson, 792 F.3d at 275.

Defendant's argument that declining to credit Comerica's interest revenues against its losses would result over-compensation, and thus would run counter to restitution's purpose, is unavailing. If Comerica had not entered into the fraudulent loan agreement with the United Entities, it could have entered into a legitimate loan agreement with a different debtor, earned interest over the life of the loan, and received the loan's entire principal back. The fraudulent conduct and default of the United Entities left Comerica with an unpaid principal balance that it was forced to charge off. The fact that Comerica earned interest revenue over the life of the loan—interest revenue it would have likely earned if it had instead contracted with a legitimate

debtor—does not warrant reducing the unpaid principal loss by interest revenues it would likely have received though a legitimate loan.

Therefore, this Court respectfully recommends that the District Court find that the appropriate restitution amount is $1,767,206.97.

### ii. Sentencing Loss Amount

The Court likewise respectfully recommends that the District Court find that Comerica's "actual loss" for sentencing purposes is the 2007 Loan's charge-off amount, $1,767,206.97, as it was a reasonably foreseeable pecuniary harm that resulted from Defendant's fraudulent conduct. See U.S.S.G. § 2B1.1 cmt. n.3(A)(i). There is no evidence in the record that Defendant intended any loss, so the Court recommends respectfully that the District Court consider $1,767,206.97 to be "the greater of actual loss or intended loss." See id. § 2B1.1 cmt. n.3(A)).

### A. Pecuniary Harm

The Court respectfully recommends that the District Court find that Comerica suffered a pecuniary harm of $1,767,206.97. According to the PSR, the 2004 Loan ended with an unpaid principal balance of $437,851.37, and the 2007 Loan ended with an unpaid principal balance of $1,947,097.93. See PSR ¶ 11. The Probation Department submits that actual loss Comerica suffered is $2,384,949.30, the sum of the two unpaid principal balances. See id. There are two problems with this analysis. First, as discussed in Section III(a), supra, the Government has provided insufficient evidence that the Loan 34 Spreadsheet is associated with the 2004 Loan, and the Court is unable to conclude that the 2004 Loan ended with principal balance of $437,851.37 or any other amount.

Second, the Probation Department's recommendation does not take into account the funds that Comerica applied to reduce the loans' principal balances, which constitute "credits

against loss."  The Government represents that, after the United Entities defaulted, Comerica "reallocated certain monies it had received . . . towards the reduction of the principal value of the 2004 and 2007 Loans."  See ECF No. 36 at 3.  This reallocation reduced the 2004 Loan's principal balance to $0 and the 2007 Loan's principal balance to $1,767,206.97.  The final $1,767,206.97 balance is the only amount that Comerica charged off as a loss.  The IRS Loss Information Spreadsheet supports the accuracy of the charge-off amount, and Defendant has not challenged the sufficiency of the evidence supporting it.  Accordingly, the Court finds that the final charge-off amount for the 2007 Loss represents Comerica's actual pecuniary harm.

Although the funds Comerica voluntarily reallocated to pay down the principal balances can be appropriately considered "credits against loss," the same is not true of payments the United Entities made during the scheme that reduced only outstanding interest and not principal. Defendant argues that the Court should determine that Comerica did not suffer any pecuniary harm, because the payments the United Entities made that went only toward interest constitute credits against loss.  See ECF No. 33 at 26.  The Government argues that this interest revenue-netting approach is inappropriate in determining pecuniary harm.  See ECF No. 41 at 2.  The Government relies on Peugh, supra, in which the Seventh Circuit held that "interest, whether paid or unpaid, is to play no role in the calculation."  See Peugh, 675 F.3d 736, 741-42.  The Government also relies on two Ninth Circuit cases that held similarly.  See Davoudi, 172 F.3d at 1136 (rejecting the defendant's argument "that for purposes of both custodial sentencing and restitution the district court should have offset [the victim's] loss by the over $100,000 in interest he paid to [the victim] before defaulting"); United States v. Allen, 88 F.3d 765, 770-71 (9th Cir. 1996) ("[T]he district court used only the loan principal to calculate the 'amount of the loan;' it did not consider the accrued interest.  Therefore, payments made towards interest cannot be

22

considered as repayments made on the loan. The district court correctly excluded the $54,989.15 in interest payments from the loss calculation.").

This Court agrees with the reasoning of the Government. The United Entities made interest payments so that the fraudulent scheme could continue. Courts in this circuit have held that such payments should not be used to offset the gross loss amount. See Vilar, 729 F.3d at 96 n.34; Barbera, 2005 WL 2709112, at *5. The Court is persuaded by Rivernider's rejection of the interest-netting approach in the restitution context, as well as by other courts that have rejected the approach in the sentencing context. See Rivernider, 828 F.3d 91, 115 (2d Cir. 2016) (rejecting interest-netting approach in calculating restitution, and noting in the same discussion that the Sentencing Guidelines exclude interest from the loss calculation); Peugh, 675 F.3d at 741; Davoudi, 172 F.3d at 1136. This Court does not believe that interest revenues that Comerica could have earned by entering an agreement with a legitimate debtor—in addition to principal repayment—should be considered "credits against loss." Instead, here, "credits against loss" should include only moneys that were allocated to paying down the principal balances, because the remaining principal balance is what Comerica was forced to charge off as a loss suffered.[9]

## B. Foreseeability And Causation

The Court respectfully recommends finding that loss of the $1,767,206.97 charge-off amount was a foreseeable result of Defendant's fraudulent conduct. The Court is unpersuaded

---

[9] The Court is not persuaded by the cases on which Defendant relies, which do not directly address the disputed issue in this case. See, e.g., Abrahamson v. Fleschner, 568 F.2d 862, 878 (2d Cir. 1977) (discussing damages in civil fraud case); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir. 1994) (same); United States v. Holiusa, 13 F.3d 1043 (7th Cir. 1994) (discussing netting approach in Ponzi scheme case).

by Defendant's argument that the Government "has not shown that [Defendant] could reasonably foresee that the fully (perhaps even more than fully) collateralized loan, which was to remain so over the entire six-year course of its performance, would nevertheless leave an unpaid principal balance due following an exigent bankruptcy sale of its collateral."  See ECF No. 33 at 29. Defendant is incorrect.  As discussed, that an unpaid principal balance could remain after sale of the collateral is "an eminently foreseeable consequence" of the conspiracy to commit fraud.  See Mallory, 709 F. Supp. 2d at 458; Turk, 626 F.3d at 750-51; Barbarino, 612 F. App'x at 628.  As discussed in Turk and Mallory, it need not have been foreseeable that an unpaid principal amount would remain after the collateral was sold and the proceeds applied to offset other balances, as a "defendant can never know what the collateral's value will be at that arbitrarily chosen time." Turk, 626 F.3d at 744.

Accordingly, the Court respectfully recommends that the District Court find that Comerica suffered an actual loss of $1,767,206.97 for sentencing purposes in connection with Defendant's fraud conviction.

## IV. Conclusion

For the foregoing reasons, this Court respectfully recommends that the District Court find that $1,767,206.97 is the appropriate amount for both loss and restitution in connection with Defendant's fraud conviction.

## V. Objections

This report and recommendation will be filed electronically.  Any written objections to this report and recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this report.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b).  Any request for an extension of time for filing objections must be directed to the District Judge prior

to the expiration of the fourteen-day period for filing objections.  Failure to file objections within fourteen days will preclude further review of this report and recommendation either by the District Court or the Court of Appeals.  See Miller v. Brightstar Asia, Ltd., 43 F.4th 112, 120 (2d Cir. 2022) (stating that, "although Rule 72 applies only to the district court's review of a report and recommendation, this court has adopted the rule that when a party fails to object timely to a magistrate's recommended decision, it waives any right to further review of that decision") (internal citation & quotations omitted).

Dated: Brooklyn, New York
      February 16, 2024

*Vera M. Scanlon*
VERA M. SCANLON
United States Magistrate Judge